FIRST DISTRICT COURT OF APPEAL
STATE OF FLORIDA

_____

No. 1D2024-0004

_____


CHARLES ADELSON,

   Appellant,

   v.

STATE OF FLORIDA,

   Appellee.


_____


On appeal from the Circuit Court for Leon County.
Stephen S. Everett, Judge.

July 1, 2026


ROWE, J.

Dan Markel (Markel) was murdered at his home in 2014. In the twelve years since the murder, five defendants were charged, convicted, and sentenced for their roles in the plot to murder Markel. Charles Adelson (Adelson), Markel's brother-in-law, was the fourth defendant to be convicted. After a jury trial, Adelson was found guilty of first-degree murder, conspiracy to commit murder, and solicitation to commit murder. This is his direct appeal.

Adelson argues that the trial court erred when it: (1) denied his motion for a change of venue, (2) denied his motion to strike

the venire panel, (3) refused to enter into evidence certain text messages, and (4) excluded hearsay evidence from a recorded phone call. Adelson also argues that the cumulative effect of the alleged errors deprived him of a fair trial. We affirm without further comment Adelson's third and fourth claims of trial court error and his claim of cumulative error. As we explain below, we also affirm his first two claims of error.

I.

In 2014, Markel was sitting inside his car, in his home garage, when he was shot twice in the head. The investigation into the murder unraveled a conspiracy that connected the family of Markel's wife, Wendi Adelson (Wendi) to the shooting. Before the murder, Markel and Wendi, who were recently divorced, were involved in a contentious court battle over Wendi's petition to relocate with their two sons. Wendi, her parents (Donna and Harvey Adelson), and her brother (Adelson) all wanted Wendi to leave Tallahassee with the children and return to South Florida where Wendi's family lived. Donna even suggested that Wendi offer Markel $1 million to allow Wendi to relocate to South Florida with the children. Markel adamantly objected to the children's relocation to South Florida and opposed Wendi's petition for relocation.

Investigators quickly developed Adelson as a suspect in Markel's murder. Hours after the murder, law enforcement interviewed Wendi. She volunteered that her family might have been involved in the murder. She told investigators that Adelson once joked that he bought Wendi a television as a divorce gift because it was cheaper than hiring a hitman.

Through further investigation, law enforcement obtained surveillance videos from multiple sources, showing that on the morning of the murder Markel had been followed by a rental car as he drove to his sons' school, the gym, and then returned home. Investigators determined that the car stalking Markel was rented by Luis Rivera (Rivera) and Sigfredo Garcia (Garcia).

Law enforcement was then able to connect Garcia to the Adelsons through Adelson's former girlfriend, Katherine

2

Magbanua (Magbanua). Magbanua and Adelson had dated and remained in touch with one another. Magbanua was romantically involved with Garcia, who was the father of her children. Investigators also learned that two months after Markel's murder, Magbanua began receiving a salary from the Adelsons' dental practice—even though there was no evidence that she worked there.

Eventually, Rivera[1] confessed to his involvement in the conspiracy to murder Markel. Rivera told investigators that Magbanua hired Garcia to kill Markel, then Garcia approached Rivera, a member of the Latin Kings, to complete the job. Rivera understood from Magbanua that the Adelsons wanted Markel dead so that Wendi and her children could relocate to South Florida. Rivera, Garcia, and Magbanua were paid $100,000 to kill Markel. They were paid with $100 bills that were stapled together in increments of $1,000. Investigators later learned that Adelson habitually kept his money stapled together in this manner.

Rivera's confession led to the arrests, trials, and convictions of Magbanua[2] and Garcia[3]. After her conviction, Magbanua

---

[1] On October 7, 2019, Rivera pleaded guilty to second-degree murder and was sentenced to nineteen years in prison to be served concurrent with a federal conviction. He did not appeal his judgment and sentence.

[2] On September 1, 2022, Magbanua was convicted of first-degree murder, conspiracy to commit murder, and solicitation to commit murder. The trial court sentenced her to life in prison on count one, followed by consecutive terms of thirty years in prison on the remaining counts. This court affirmed her convictions and sentences on direct appeal. *Magbanua v. State*, 415 So. 3d 297 (Fla. 1st DCA 2025).

[3] On October 17, 2019, Garcia was convicted of first-degree murder and conspiracy to commit murder. The trial court sentenced him to life in prison on count one, followed by a consecutive term of thirty years in prison. This court affirmed his

admitted that Adelson gave her money for the hit on Markel and provided her with the necessary information to locate Markel. Magbanua then passed that information to Garcia and Rivera. Based on information obtained from Magbanua and other evidence developed by investigators, Donna was charged with Markel's murder. After a 2025 jury trial, Donna was convicted for her involvement in the conspiracy to murder Markel.[4]

Adelson was also tried by a jury. He was found guilty of first-degree murder, conspiracy to commit murder, and solicitation to commit murder. The trial court sentenced him to life in prison and two consecutive terms of thirty years in prison. This appeal follows.

## II.

Adelson argues that the trial court erred when it denied his motion for a change of venue. About a month before jury selection began, defense counsel moved to use an eleven-page juror questionnaire to aid in the selection of a fair and impartial jury. Defense counsel asserted that there was a legitimate concern that the publicity surrounding Markel's murder had so infected the community that a change in venue may ultimately be required. The court denied the motion, finding that individual voir dire would satisfy defense counsel's concerns about pretrial publicity.

Jury selection was conducted over three days. The court called in a panel of fifty prospective jurors at a time, read a brief description of the case, and determined whether the prospective jurors were qualified to serve. Due to the publicity surrounding the

convictions and sentences on direct appeal. *Garcia v. State*, 327 So. 3d 947 (Fla. 1st DCA 2021).

[4] Donna was convicted of first-degree murder, conspiracy to commit murder, and solicitation to commit murder. The trial court sentenced her to life in prison, followed by a consecutive term of thirty years in prison. Her direct appeal is pending in this court. *See Adelson v. State*, 1D2025-2848.

4

murder, the court individually asked 130 prospective jurors some form of these questions:

1. What do you know about this case?

2. What are the sources that you've obtained this knowledge from?

3. Based on what you know, do you have an opinion about Adelson's guilt or innocence?

4. Can you set aside your present knowledge, disregard it, and render a verdict solely on the evidence that is presented in the courtroom?

5. Can you be fair and impartial?

After hearing the responses to the court's questions, the prosecutor and defense counsel were permitted to ask follow-up questions.

Out of the 130 prospective jurors interviewed, ninety-six had heard about the case. Fifty-four of those ninety-six prospective jurors admitted that they had formed an opinion about the case— and fifty-three of them believed that Adelson was guilty. The trial court excused all fifty-four prospective jurors who had formed an opinion about the case. The remaining panel members returned for group voir dire.

After the trial court and counsel had individually questioned all 130 prospective jurors, defense counsel orally moved for a change of venue. Counsel argued that the prospective jurors' responses during individual questioning showed that Adelson could not receive a fair trial in Leon County because of the extensive pretrial publicity surrounding Markel's murder. Counsel argued that "as demonstrated by the answers from the mayor of the city, right down to the citizens of the county, . . . there is not a single person, except for one man whose opinion I discount, that has . . . said anything other than that this man is guilty." As for prospective jurors who admitted that they had been exposed to publicity about the murder but claimed that they had not formed

5

an opinion about Adelson's guilt, defense counsel contended that the court should not find them credible.

The prosecutor objected to defense counsel's argument that a fair trial could not be conducted in Leon County. The prosecutor pointed out that in just two days of jury selection, roughly sixty of the prospective jurors individually questioned by the court had passed the publicity test. Based on the responses given by the prospective jurors, the court denied the motion. The court noted that several prospective jurors indicated that they had "no exposure to this case whatsoever." The court further explained that "the other jurors who have had . . . exposure to the local media . . . have indicated that they will follow the law and they will render a verdict that's based solely on the evidence." The case went on to group voir dire.

When selecting the jury, both sides exhausted their peremptory challenges (ten for the main jury and one for the alternate). At the end of jury selection, the trial court asked Adelson if he accepted the jury. Adelson replied, "Yes, your honor." The trial court then swore in the jury. Defense counsel did not renew the motion for change of venue before the jury was sworn.

A.

Adelson argues that the trial court reversibly erred when it denied his motion for a change of venue, depriving him of his constitutional right to trial by an impartial jury. He contends that the community was so pervasively exposed to prejudicial media coverage about Markel's murder that it was impossible for Adelson to seat an impartial jury in Leon County. And he asserts that prospective jurors who claimed to have no information about the murder or who claimed to not have formed an opinion about Adelson's guilt should not be believed.

The United States Constitution and the Florida Constitution guarantee a criminal defendant the right to a public trial by an impartial jury. *See* Amend. VI, U.S. Const.; Art. I, § 16(a), Fla. Const. The right to an impartial jury was well established at common law. *Matarranz v. State*, 133 So. 3d 473, 491 (Fla. 2013). Essential to that right was that "the truth of every accusation . . .

6

should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbours, *indifferently chosen and superior to all suspicion.*" *Duncan v. Louisiana,* 391 U.S. 145, 151 (1968) (emphasis supplied) (quoting 4 W. Blackstone, Commentaries on the Laws of England 349 (T. Cooley ed. 1899)).

Jurors are considered impartial when their minds do not "contain any element of prejudice for or against either party in a cause to be tried before him" and when the jurors can "render a verdict solely on the evidence presented and the law given by the court." *Matarranz,* 133 So. 3d at 484. And the test to determine juror partiality is whether the juror possesses "the state of mind necessary to render a verdict in accordance with the evidence and not based upon preconceived opinions." *Id.* at 489; *see also Lockhart v. McCree,* 476 U.S. 162, 178 (1986) (defining an impartial jury as one comprised of "jurors who will conscientiously apply the law and find the facts" (quoting *Wainwright v. Witt,* 469 U.S. 412, 423 (1985)) (emphasis omitted)).

But to be impartial, must the jury and individual jurors be ignorant of the cause to be tried? Not at common law. Then, it was expected that jurors drawn from the community would be knowledgeable about the case and that they would decide cases based on that personal knowledge. *DK Arena, Inc. v. EB Acquisitions I, LLC,* 112 So. 3d 85, 92 n.4 (Fla. 2013). But over time, it was recognized that convenience gained by an informed jury could be undermined "by another very natural and almost unavoidable inconvenience; that jurors, coming out of the immediate neighborhood, would be apt to intermix their prejudices and partialities in the trial of right." 3 W. Blackstone, Commentaries on the Laws of England 359–60 (1768). To avoid this problem, the American criminal justice system moved away from one empaneling juries with informed jurors to one seeking to empanel juries with little to no knowledge about the case. *Id.*

But even under the modern trend, jurors need not be *ignorant* of the cause to be tried before them, nor does knowledge of the cause necessarily render a juror partial. *See United States v. Tsarnaev,* 595 U.S. 302, 312 (2022). This is true even for juries for trials involving high-profile crimes—when members of the venire will have been exposed to some information about the crime

through pretrial publicity. *See Reynolds v. United States*, 98 U.S. 145, 155–156 (1879) ("[E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits."); *Davis v. State*, 461 So. 2d 67, 69 (Fla. 1984) (observing that"[m]edia coverage and publicity are only to be expected when murder is committed").

Pretrial publicity will give rise to a presumption of prejudice among the members of the venire only in the most extreme circumstances. *Skilling v. United States*, 561 U.S. 358, 381 (2010). A change of venue is appropriate only when "the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and pre-conceived opinions that jurors could not possibly put these matters out of their minds and try the case solely on the evidence presented in the courtroom." *Rolling v. State*, 695 So. 2d 278, 284 (Fla. 1997) (quoting *McCaskill v. State*, 344 So. 2d 1276, 1278 (Fla. 1977)).

Adelson argues that the pretrial publicity surrounding his trial was so pervasive and inflammatory that it was impossible to empanel an impartial jury in Leon County. As we will explain, he failed to preserve his arguments for appeal. And he has not met his burden to show fundamental error.

B.

Adelson contends that the trial court's denial of his oral motion for a change of venue violated his rights to an impartial jury under the federal and state constitutions. But even constitutional rights are subject to preservation requirements. *United States v. Olano*, 507 U.S. 725, 731 (1993) ("No procedural principle is more familiar to this Court than that a constitutional right . . . may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." (quoting *Yakus v. United States*, 321 U.S. 414, 444 (1944))). And here, Adelson failed in two ways to preserve his challenge to the trial court's ruling.

8

First, he failed to make his motion in writing. To secure the constitutional right of a criminal defendant to a public trial by an impartial jury, the Florida Supreme Court adopted Florida Rule of Criminal Procedure 3.240. Under that rule, a defendant may move for a change of venue when a "fair and impartial trial cannot be had in the county where the case is pending." Fla. R. Crim. P. 3.240(a). The rule requires that a motion seeking a change of venue be in writing. Fla. R. Crim. P. 3.240(b). The rule also requires the movant to attach an affidavit "setting forth facts on which the motion is based" and "a certificate by the movant's counsel that the motion is made in good faith." *Id.*

Adelson's counsel did not comply with the rule in several respects: he did not file a written motion, he never submitted supporting affidavits to show the extent of pretrial publicity, nor did he certify that the motion was made in good faith. Due to these failures, Adelson's challenge to the trial court's ruling on his motion to change venue was not preserved for appellate review. *See Allen v. State*, 174 So. 2d 538, 540 (Fla. 1965) (affirming first-degree murder conviction and sentence of death and holding that a motion for change of venue was properly denied where it was unsupported by affidavits). *But see Provenzano v. State*, 497 So. 2d 1177, 1181–82 (Fla. 1986) (affirming first-degree murder conviction and sentence of death and holding that an oral request for a change of venue does not preserve for appellate review, but addressing "the substantive aspects" of the issue "to allay any fear that appellant did not receive a fair trial"); *Holsworth v. State*, 522 So. 2d 348, 350 n.1 (Fla. 1988) (noting that the record did not show that appellant complied with the rule, but reviewing on the merits claim that the trial court erred when it denied an oral motion for change of venue).

Second, notwithstanding his failure to comply with rule 3.240, Adelson failed to preserve his challenge to the trial court's venue ruling because his counsel failed to renew the venue motion before the jury was sworn. *See Smith v. State*, 320 So. 3d 20, 27 (Fla. 2021) (explaining that defense counsel failed to preserve challenge to trial court's ruling on venue motion because he did not renew the motion before the jury was sworn; reviewing claim for fundamental error); *Armstrong v. State*, 862 So. 2d 705, 719 (Fla. 2003) (holding that Armstrong did not preserve argument on the denial of a

9

motion for change of venue because defense counsel failed to renew the motion after the jury was selected). The purpose of the preservation requirement is to "place the trial judge on notice that error may have been committed, and provide him an opportunity to correct it at an early stage of the proceedings." *Harrell v. State*, 894 So. 2d 935, 940 (Fla. 2005) (cleaned up). The preservation requirement prevents a defendant from "stand[ing] by silently while an objectionable juror is seated and then, if the verdict is adverse, obtain a new trial." *Trotter v. State*, 576 So. 2d 691, 693 (Fla. 1990); *Matarranz*, 133 So. 3d at 482 (explaining that the failure to renew an objection gives the impression that the defendant was satisfied with the selected jury).

Here, it could have been that after voir dire, Adelson and his counsel were satisfied with the jury seated for his trial and made a strategic decision not to renew the motion to change venue. Adelson's counsel did not renew the motion before the jury was sworn. Because he failed to preserve this issue below, we affirm the trial court's ruling on the venue motion. And Adelson cannot show that the trial court fundamentally erred by denying the motion for change of venue. *See Smith*, 320 So. 3d at 27.

C.

An error is considered fundamental when it "reach[es] down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." *Knight v. State*, 286 So. 3d 147, 151 (Fla. 2019) (quoting *Brown v. State*, 124 So. 2d 481, 484 (Fla. 1960)). And Adelson cannot show fundamental error on this record.

When ruling on a motion for change of venue, a trial court must consider: "(1) the extent and nature of any pretrial publicity; and (2) the difficulty encountered in actually selecting a jury." *Rolling*, 695 So. 2d at 285. We begin with the second prong—the difficulty encountered by the trial court in seating a jury. The Florida Supreme Court has instructed trial courts to endeavor to empanel a jury *before ruling on a motion for change of venue*, explaining that voir dire affords an opportunity to determine whether individuals "who have not been seriously infected by the publicity can be found." *Armstrong*, 862 So. 2d at 718–19

10

(explaining that the "motion for change of venue was prematurely filed before an attempt to select an impartial jury"). The trial court followed those instructions in this case.

To determine whether impartial jurors could be found, the trial court began by individually interviewing 130 prospective jurors. The court examined the jurors to determine the extent of their knowledge from pretrial publicity and to assess whether they had formed an opinion about the case. Most of them—ninety-six—had heard about Markel's murder. Of those ninety-six jurors, fifty-four had formed an opinion about the case, and all but one of the fifty-four prospective jurors concluded that Adelson was guilty. Still, none of the jurors who formed an opinion about Adelson's guilt served on the jury. *See Ross v. Oklahoma*, 487 U.S. 81, 86 (1988) ("Any claim that the jury was not impartial, therefore, must focus . . . on the jurors who ultimately sat."); *see also Esty v. State*, 642 So. 2d 1074, 1077 (Fla. 1994) (affirming the denial of a motion for a change of venue when the record showed that the jurors who actually served "stated affirmatively and unequivocally that they could put aside [prior] knowledge and decide the case solely on the evidence presented at trial"). Indeed, the trial court erred on the side of exclusion when the court perceived that any juror had potentially prejudged the case.

The record, as detailed below, also reveals that the jurors actually seated had very limited knowledge of the case. Of the twelve individuals who were selected to serve, seven reported that they did not regularly watch the news. Four others had heard about the Markel case on the local news or read about it in the local paper. And one juror heard about the case on the radio.

Juror A.M. stated that she had briefly seen something about the murder on WCTV within the last year. Yet she maintained that she had not formed an opinion about the case because she did not know Adelson. She repeated this sentiment during group voir dire. When defense counsel asked if anyone did not believe that Adelson was innocent until proven guilty, A.M. responded that it was unfair to make assumptions about people and that she would "need to hear the facts."

11

Juror B.G. remembered hearing about the murder when it happened ten years ago. But she did not regularly consume the news. B.G. remembered seeing a preview for a television special about the murder, but she did not watch the special. In fact, she was unaware that there was more than one special until defense counsel mentioned it.

Similarly, Juror T.B. said he had seen something about the murder on WCTV, but he only watched the news "in spurts." When asked if he could be fair and impartial, he responded, "[a]bsolutely."

Juror J.K. regularly checked the news online, but it had been some months since he had seen anything about the case. He knew that Adelson was accused of hiring someone to murder Markel. But when asked if he believed that allegation, J.K. responded, "I don't think I have enough information to make that sort of judgment."

Juror D.M. knew "[b]asically nothing" about the case, and he did not read the local newspaper, the *Tallahassee Democrat*, nor did he watch the local news. He worked at FSU during the time of the murder, so he remembered that a law professor had been murdered. He affirmed that he did not have an opinion about Adelson's guilt.

Juror J.H. also had limited knowledge of the case. He knew that a professor had been shot, but he clarified that it had been years since he had seen anything about the case on the news. He explained that he did not have an opinion about Adelson's guilt because he did not "know nothing."

Juror O.B. remembered hearing about the murder when it occurred, but she had not watched any news broadcasts or read any news articles about the murder. She explained that she had never seen Adelson on the news. In fact, she said that the first time she heard Adelson's name was during jury selection.

Juror R.P. heard about the case on the radio, but he could not remember any details. He asserted that he had not formed an opinion about Adelson's guilt, he could decide the case based on the evidence presented at trial, and he could be impartial.

Juror K.S. asserted that she knew nothing about the case. And she denied reading or hearing about the case. When asked if she watched any news reports about the murder, she responded, "I don't watch the news. It's too depressing." And she asserted that she could not remember the last time she read the *Tallahassee Democrat*.

What all the seated jurors had in common was that they each communicated to the trial court that they had not formed an opinion about Adelson's guilt and were able to convince the trial court that they could be fair and impartial. *See Ellerbee v. State*, 232 So. 3d 909, 921 (Fla. 2017) (holding that the record showed that the trial court was able to seat an impartial jury even when a large percentage of the venire members "indicated they either had been previously exposed to the facts of the case or knew someone involved in the trial").

Even so, Adelson insists that the jurors were not being truthful when they stated that they could be impartial and set aside any knowledge of the murder stemming from pretrial publicity. He invites this court to look behind the juror's responses and the trial court's credibility determinations. We must decline the invitation. This is because we must afford great deference to the trial court's decision on whether a prospective juror is able to "lay aside any bias or prejudice and render his verdict solely upon the evidence presented and the instructions on the law given." *State v. Murray*, 262 So. 3d 26, 44 (Fla. 2018) (quoting *Lusk v. State*, 446 So. 2d 1038, 1041 (Fla. 1984)) (explaining that trial courts are entitled to deference in this area due to their unique perspective of observing the jurors' answers to voir dire)); *see also Skilling*, 561 U.S. at 386 ("When pretrial publicity is at issue, 'primary reliance on the judgment of the trial court makes [especially] good sense' because the judge 'sits in the locale where the publicity is said to have had its effect' and may base her evaluation on her 'own perception of the depth and extent of news stories that might influence a juror.'" (quoting *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991))). Great deference is warranted because the trial judge's evaluation of jurors is informed by factors "impossible to capture fully in the record, such as a prospective juror's inflection, sincerity, demeanor, candor, body language, and

apprehension of duty." *Tsarnaev*, 595 U.S. at 312–13 (cleaned up) (quoting *Skilling*, 561 U.S. at 386).

On this record, Adelson has failed to show that the trial court encountered difficulty in seating an impartial jury. After questioning 130 prospective jurors over three days, the trial court evaluated their credibility and determined that the jurors seated for Adelson's trial could be impartial. And nothing in the record supports an argument that any of the seated jurors were not impartial. For this reason, Adelson cannot show that it was impossible for the trial court to seat an impartial jury.

We now turn back to the first prong of the *Rolling* test and consider whether the duration, intensity, and nature of the pretrial publicity surrounding Markel's murder made it impossible to seat an impartial jury in Leon County. Adelson had the burden to show that the pretrial publicity was prejudicial and inflammatory and that the prejudicial pretrial publicity saturated the community where the trial was held. *See Spivey v. Head*, 207 F.3d 1263, 1270 (11th Cir. 2000).

When making the discretionary determination of whether pretrial publicity adversely affected the impartiality of the prospective jurors, the trial court must consider:

> (1) the length of time that has passed from the crime to the trial and when, within this time, the publicity occurred; (2) whether the publicity consisted of straight, factual news stories or inflammatory stories; (3) whether the news stories consisted of the police or prosecutor's version of the offense to the exclusion of the defendant's version; (4) the size of the community in question; and (5) whether the defendant exhausted all of his peremptory challenges.

*Rolling*, 695 So. 2d at 285 (internal citations omitted).

Generally, the trial court can make determinations on the publicity factors from the affidavits and other evidence submitted by the defense in support of a motion for change of venue. *See, e.g.*, *Manning v. State*, 378 So. 2d 274, 276 (Fla. 1979) (noting that

14

defense counsel attached numerous newspaper articles and affidavits from fifteen people asserting that they did not believe that Manning could receive a fair trial in Columbia County); *Sheppard v. Maxwell*, 384 U.S. 333 at 343–46 (1966) (describing in detail the contents of articles and news programs about the case); *Estes v. Texas*, 381 U.S. 532, 536 (1965) (describing the media coverage of the pretrial hearings); *Spivey*, 207 F.3d at 1270 (describing the contents of the newspaper articles that covered the case).

But Adelson presented no evidence below nor did he make any argument on appeal about these factors. He relies only on the responses of the prospective jurors during individual questioning and voir dire, arguing that their exposure to pretrial publicity created a presumption that an impartial jury could not be seated in Leon County. But he has failed to meet the heavy burden to show that pretrial publicity tainted the venire in Leon County to the extent that it created a presumption of partiality. *See Spivey*, 207 F.3d at 1270 (holding that a defendant's burden "to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one" (quoting *Coleman v. Kemp*, 778 F.2d 1487, 1537 (11th Cir. 1985)); *Manning*, 378 So. 2d at 276 (holding that it is the defendant's burden to show "that the setting of the trial is inherently prejudicial because of the general atmosphere and state of mind of the inhabitants in the community"); *Provenzano*, 497 So. 2d at 1182 ("The burden is on the defendant to raise a presumption of partiality.").

A "presumption of prejudice . . . attends only the extreme case." *Skilling*, 561 U.S. at 381; *see also Rideau v. Louisiana*, 373 U.S. 723 (1963) (holding that the denial of a motion for a change of venue violated the defendant's due process rights when the local news station repeatedly broadcasted the defendant's interrogation where he admitted committing murder, robbery, and kidnapping); *Estes v. Texas*, 381 U.S. 532 (1965) (holding that media coverage manifestly tainted a criminal prosecution after reporters and television crews overran the courtroom and "bombard[ed]" the community with the pretrial hearing); *Armstrong*, 862 So. 2d at 719 ("[T]he mere fact that jurors were exposed to pretrial publicity is not enough to raise the presumption of unfairness."). And in the case of a high-profile crime, "[p]rominence does not necessarily

produce prejudice, and juror *impartiality* . . . does not require *ignorance.*" *Skilling*, 561 U.S. at 381. A change of venue is appropriate only when "the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and pre-conceived opinions that jurors could not possibly put these matters out of their minds and try the case solely on the evidence presented in the courtroom." *Rolling*, 695 So. 2d at 284 (quoting *McCaskill*, 344 So. 2d at 1278); *Davis*, 461 So. 2d at 69 ("The critical question to be resolved, however, is not whether the prospective jurors possessed any knowledge of the case, but, rather, whether the knowledge they possessed created prejudice against [the defendant].").

Almost ten years had passed between Markel's murder and Adelson's trial. The investigation into Markel's murder continued to receive media attention during those ten years as other members of the murder conspiracy were tried and convicted. But defense counsel offered no evidence—other than through the responses from the prospective jurors[5] to questioning—to show how much publicity occurred during that relevant period, whether the coverage of the murder was factual or inflammatory, or whether the coverage excluded Adelson's version of evidence. *Compare Foster v. State*, 778 So. 2d 906, 913 (Fla. 2000) (observing that Foster presented the court with voluminous records of newspaper articles and television news accounts of pretrial publicity); *Manning*, 378 So. 2d at 276 (noting that the defendant presented extensive evidence that every prospective juror "had knowledge of exparte [sic] statements of the evidence against the

---

[5] Of the twelve jurors seated, four had heard about the murder through the local news stations and one heard about it on the radio. Of the prospective jurors not selected, almost fifty heard about the murder through local television news broadcasts or the *Tallahassee Democrat*. Ten heard about the murder on the radio (including *The Preston Scott Show*) and six had listened to podcasts (including *Over My Dead Body*). Four had watched the 20/20 or Dateline specials highlighting the case, four had seen coverage on CourtTV, and three had watched videos about the murder on YouTube.

accused," and "the victims were well-liked caucasian [sic] deputies of the local sheriff's department and the accused was a young black male from outside the community"). Most of the prospective jurors learned about Markel's murder through news outlets like ABC, CNN, Fox, the *Tallahassee Democrat* newspaper, and WCTV—a local television station affiliated with CBS.[6] Nothing in the record suggests that these news sources were anything other than factual or that the reports included anything inflammatory about Adelson.

Arguing about the impact of pretrial publicity on the venire, Adelson characterizes Leon County as a "small" community.[7] But this characterization is inapt. The population of Alachua County in the 1990's, when Rolling was tried, was far smaller than Leon County when Adelson was tried.[8] Even so, the trial court was able

_____

[6] In his reply brief, Adelson argues that the media coverage of the murder was markedly different from the coverage in *Foster* and *Rolling*. Both cases were tried over twenty-five years ago, when many people relied on local newspapers and nightly television broadcasts to consume the news, so the "coverage was episodic and finite." Adelson argues that when the *Foster* and *Rolling* cases were tried, "[t]here was no 24-hour social media commentary, no podcasts revisiting the case, no algorithm sending repeated reminders, no discussion threads allowing community members to reinforce one another's views, and no streaming platforms releasing case-related content that are accessible on demand." But Adelson did not present the court with affidavits or any evidence showing the extent of social media or podcast coverage and how that coverage affected the venire. And the limited statements by potential jurors about their exposure to pretrial publicity were insufficient to create a presumption that an impartial jury could not be empaneled in Leon County.

[7] According to the United State Census Bureau, Leon County had 292,198 residents in 2020. *See* U.S. Census Bureau, 2020 Census Population and Housing Map, Florida, https://public.tableau.com/app/profile/us.census.bureau/viz/share d/56MBKF9GJ.

[8] In 1990, four years before Rolling's trial, Alachua County had 181,596 residents. *See* U.S. Census Bureau, 1990 Census of

17

to empanel an impartial jury for the Rolling trial in the university town of Gainesville in three weeks. In Adelson's case, it took the trial court just three days. *Cf. Foster*, 778 So. 2d at 914 (comparing the much larger population in Lee County at the time of Foster's trial to the population of Alachua County when Rolling was tried).

Adelson emphasizes that of the 130 prospective jurors interviewed during jury selection, ninety-six had heard about the Markel murder. But again Adelson ignores that prospective jurors need not be "totally ignorant of the facts of the case nor do they need to be free from any preconceived notion at all" as long as the prospective jurors assure the court that they can be impartial despite their extrinsic knowledge. *Rolling*, 695 So. 2d at 285; *McCaskill*, 344 So. 2d at 1278 ("Knowledge of the incident because of its notoriety is not, in and of itself, grounds for a change of venue." (quoting *Kelley v. State*, 212 So. 2d 27, 28 (Fla. 2d DCA 1968))). This is true even in high-profile cases.

For example, in *Rolling*, the defendant was a serial killer, who murdered five college students at the University of Florida over four days in 1990. 695 So. 2d at 281–82. The case garnered nationwide attention. Rolling sought a change of venue from Alachua County, arguing that during the three and a half years after the murder, the pretrial publicity was "so pervasive and prejudicial" that the court should presume the entire venire was biased against him. *Id.* at 283. The supreme court rejected Rolling's argument, explaining that "pretrial publicity is normal and expected in certain kinds of cases, like this one, and that fact standing alone will not require a change of venue." *Id.* at 285; *see also Davis v. State*, 383 So. 3d 717, 734 (Fla. 2024). Instead, the court explained, "[t]he ability to seat an impartial jury in a high-profile case may be demonstrated by either a lack of extrinsic knowledge among members of the venire or, assuming such knowledge, a lack of partiality." *Rolling*, 695 So. 2d at 285. The supreme court affirmed the trial court's ruling denying the motion to change venue, noting that the trial court used a "meticulous jury

Population General Population Characteristics Florida, https://www2.census.gov /library/publications/decennial/1990/cp-1/cp-1-11-1.pdf.

18

selection and screening process" to seat an impartial jury over a three-week period. *Id.* at 286.

In *Foster*, another high-profile murder case, the supreme court affirmed the trial court's denial of the defendant's motion for a change of venue. 778 So. 2d at 912–14. Foster was a leader of a gang of teenagers who called themselves the "Lords of Chaos." *Id.* at 909–10. Foster and his gang murdered a high school teacher who caught the gang vandalizing the school. Foster moved for a change of venue, presenting "voluminous records of various newspaper articles and television news accounts," including stories that referred to Foster as a "psychopath" and a "redneck, racist, gun-crazed punk." *Id.* at 913. Many of the newspaper articles and television broadcasts paint Foster in a negative light. *Id.* One article reported Foster's plan to go to Disney World and kill Black tourists. Another referred to Foster as a psychopath, "Opie with a gun," and a "Jekyll–and–Hyde" character. Another article—published just two days before Foster's trial—read, "Old Sparky's hot jolt may await Foster." *Id.* But even with the unfavorable coverage in the media, the supreme court observed that most of the articles were published two years before trial. *Id.* The court added that the trial court dismissed all prospective jurors who admitted having a fixed opinion that would prevent them from being fair and impartial. *Id.* On that record, the supreme court held that "the media coverage as a whole did not reach such an inflammatory level to have irreversibly infected the community so as to preclude an attempt to secure an impartial jury." *Id.* at 913.

Adelson also argues that there is reason to doubt that an impartial jury was actually seated in his case. He points out that of the ninety-six prospective jurors who heard about Markel's murder, fifty-four had formed an opinion about Adelson's guilt—with all but one believing that Adelson was guilty. But Adelson cannot deny that none of those prospective jurors who had an opinion about his guilt sat on the jury. Rather, the trial court was careful to exclude any juror who had potentially prejudged the case. Nor can he show that any of the selected jurors were partial.

On this record, Adelson failed to show that "the general state of mind of the inhabitants of [Leon County was] so infected by

19

knowledge of the incident and accompanying prejudice, bias, and pre-conceived opinions that jurors could not possibly put these matters out of their minds and try the case solely on the evidence presented in the courtroom." *Rolling*, 695 So. 2d at 284 (quoting *McCaskill*, 344 So. 2d at 1278). And an impartial jury appears to have been seated for Adelson's trial. *Cf. Foster*, 778 So. 2d at 914. And so, the trial court did not err, much less fundamentally err, when it denied Adelson's motion for change of venue.

## III.

Adelson next argues that the trial court erred when it denied his oral motion to strike the entire venire because of the comments made in the jury assembly room by some of the prospective jurors. When jury selection began, the trial court instructed prospective jurors that they should not discuss the case while waiting in the assembly room. Even so, the parties discovered during jury selection that some individuals in the assembly room were ignoring the court's instructions. One prospective juror reported that someone in the assembly room stated that "it was a federal case," while another one said that the case must be about the "FSU professor." A different person complained that they would be there for a long time. After learning that the venire was not abiding by his instructions, the trial court returned to the assembly room and again instructed the prospective jurors that there was to be "no discussion concerning the subject matter of this case" until they were excused from jury selection.

Defense counsel then moved to strike the jury panel, arguing that it was impossible to know what else had been said in front of the prospective jurors in the assembly room. The trial court denied the motion concluding that he did "not have a basis to strike this entire panel as a group right now." The trial court then continued with the juror interviews.

Two other prospective jurors then reported people talking about the case in the assembly room, with one reporting that someone said that Adelson was guilty. Defense counsel again argued that the pool of prospective jurors had been tainted and renewed his motion to strike the panel. The reports of the prospective jurors discussing the case in the assembly room

20

concerned the court. To alleviate the problem, the court offered to allow the parties to watch the recordings of the assembly room to see what was being said. At that point, defense counsel did not take up the court's offer. The court then denied the motion to strike the panel. The court added that "if any independent investigation by the defense yields information that would demonstrate otherwise, I will reconsider the motion." Despite the trial court's open invitation to the defense to further investigate the issue and report back, nothing in the record or in the parties' briefs indicates that defense counsel ever accepted the trial court's offer to view the recordings or to further investigate what may have been discussed in the assembly room.

Even so, Adelson argues that the trial court abused its discretion in denying his motion to strike the venire. But he failed to preserve his argument for appellate review by not filing his motion in writing and by failing to renew his motion before the jury was sworn.

Florida Rule of Criminal Procedure 3.290 requires that "[a] challenge to the panel shall be in writing and shall specify the facts constituting the ground of the challenge." So Adelson's oral motion to strike the jury panel was legally insufficient. *Cargill v. State*, 121 So. 3d 1157, 1159 (Fla. 1st DCA 2013) (holding that the defendant's objection to the jury panel was "not open for consideration on review" because it was not in writing and was untimely).

Adelson's claim fails on preservation grounds for a second reason. To preserve jury selection issues for appellate review, a defendant must make two objections: "(1) a contemporaneous objection that puts the trial court on notice; and (2) a second objection before the jury is sworn." *Hilton v. State*, 326 So. 3d 640, 652 (Fla. 2021). By not renewing the objection before the jury was sworn, it is presumed that the objecting party abandoned any prior objection he or she may have had and was satisfied with the selected jury. *Zack v. State*, 911 So. 2d 1190, 1204 (Fla. 2005). "[T]o hold otherwise, [a defendant] could proceed to trial before a jury he unqualifiedly accepted, knowing that in the event of an unfavorable verdict, he would hold a trump card entitling him to a new trial." *Joiner v. State*, 618 So. 2d 174, 176 n.2 (Fla. 1993).

Here, the record shows that Adelson's counsel failed to make the second objection. While counsel renewed the motion during the jury selection process, he did not renew the motion again nor did he accept the panel subject to his previous objection before the jury was sworn. So this issue is unpreserved. *See Johnson v. State*, 141 So. 3d 698, 699 (Fla. 1st DCA 2014) (holding that appellant failed to preserve claim that trial court erred in denying his motion to strike a jury panel when he failed to renew the motion "once jury selection was complete or before the jury was sworn"); *Randall v. State*, 938 So. 2d 542, 544 (Fla. 1st DCA 2006) (same).

Even if we were to review his claim for fundamental error, Adelson did not meet his burden to show that the trial court fundamentally erred when it denied his motion to strike the jury panel. *See Knight*, 286 So. 3d at 151 (explaining that fundamental error occurs when a guilty verdict could not be obtained without the error). Adelson asserts that two types of statements made by prospective jurors supported his motion to strike the panel: (1) factual statements about the case, and (2) legal conclusions about Adelson's guilt. As we will explain, none of these statements were sufficiently prejudicial to warrant striking the jury panel.

As to the factual statements, the record shows that one prospective juror reported that someone in the assembly room said that "they thought it was the FSU professor" and that the case was about "the murder of the professor." That prospective juror added that she believed that "they had kids, I think it was a divorce." The same prospective juror reported that one person said, "we're screwed because we're going to be here all day." A different prospective juror represented that individuals had been talking about the case the entire day.

"[F]or the statement of one venire member to taint the panel, the venire member must mention facts that would not otherwise be presented to the jury." *Morris v. State*, 219 So. 3d 33, 41 (Fla. 2017) (quoting *Johnson v. State*, 903 So. 2d 888, 897 (Fla. 2005)). None of the prospective jurors reported anyone in the assembly room discussing details of the case, much less details that would not later be revealed at trial. Thus, none of these factual statements were so prejudicial as to taint the venire.

As to the legal conclusions, the record shows that one prospective juror reported to the court that she heard someone in the assembly room state that he believed that Adelson was guilty. Yet another prospective juror reported that she heard someone say, "I think he did it." But the expression of a prospective juror's opinion generally is insufficient to taint the remainder of the venire. *Johnson*, 903 So. 2d at 897. "Prospective jurors are frequently exposed, before and during voir dire, to innumerable comments, attitudes, and points of view, the subscription to which would be improper for an unbiased juror." *Brower v. State*, 727 So. 2d 1026, 1027 (Fla. 4th DCA 1999). The trial court is in the best position to determine whether such statements tainted the entire jury panel by questioning the remaining non-offending prospective jurors. *Id.* "To hold otherwise would impose a *per se* reversal rule, undermine the trial court's discretion, and effectively impugn the integrity of the remaining jurors who were able to disregard their inadvertent exposure to the boorish and insolent antics of their fellow citizens." *Id.*

What's more, Adelson concedes that the trial court removed for cause any prospective jurors who admitted to talking about the case. But he suggests that this remedy was insufficient because it was unknown how many members of the venire were exposed to conversations in the assembly room about the case. But the trial court afforded defense counsel the opportunity to review the recordings of the jury assembly room for this exact reason, and counsel declined the offer. Based on this record, the defense failed to show that any of the statements made in the juror assembly room tainted the jury panel. And thus, the trial court did not fundamentally err when it denied the motion to strike the panel.

Finding no error by the trial court, the judgment and sentence are AFFIRMED.

WINOKUR and M.K. THOMAS, JJ., concur.

23

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____


Michael Ufferman and Laurel Cornell Niles of Michael Ufferman Law Firm, P.A., Tallahassee, for Appellant.

James Uthmeier, Attorney General, and Robert Charles Lee, Assistant Attorney General, Tallahassee, for Appellee.